PRESENT: Powell, C.J., Kelsey, McCullough, Russell, and Mann JJ., and Millette and Mims, S.JJ.

EQT PRODUCTION COMPANY, ET AL.

v. Record No. 250430

COUNTY OF WISE, VIRGINIA, ET AL.

OPINION BY
CHIEF JUSTICE CLEO E. POWELL
MAY 21, 2026

FROM THE COURT OF APPEALS OF VIRGINIA

EQT Production Company; EQT Gathering, LLC; and Diversified Production, LLC (collectively, the "Taxpayers") appeal the Court of Appeals' decision to uphold the tax assessment of the Taxpayers' mineral lands. For the reasons that follow, we reverse.

## I. BACKGROUND

EQT Production Company and EQT Gathering, LLC (collectively "EQT") owned mineral lands in Wise County, Virginia (the "County"), possessing natural gas reserves. EQT sold its land to Diversified Production, LLC ("Diversified") in July 2018 through a bidding process (the "2018 Sale").

Pursuant to Code § 58.1-3286, the County levied taxes on the gas wells on the property, but not the gas reserves, for tax years 2018, 2019, and 2020. The taxed property consisted of 578 gas wells, 187.7 miles of gas pipelines, and 14 gas compressors at 8 stations. To calculate the tax, the County assessed the fair market value of the gas wells using the cost approach method of appraisal.[1] The County valued the lands at $134,329,600 for the 2018 and 2019 tax years, and $104,573,100 for the 2020 tax year.

---

[1] Although this case turns on whether the gas reserves should have been assessed under Code § 58.1-3286, much of the debate has centered around which valuation method is

In May 2021, the Taxpayers applied for relief from taxes levied under Code § 58.1-3286 on their mineral lands and the improvements thereon. The Taxpayers alleged that the County assessed their property in excess of its fair market value. They sought corrections of the assessments and refunds of the taxes they paid on valuations in excess of the fair market value.

The Taxpayers argued that the County violated Virginia law by only valuing the improvements on the land, such as the well infrastructure, but not the gas reserves. They contended that the gas wells have no value without the reserves, and that the well infrastructure is universally operated as a unit with the reserves. According to the Taxpayers, it is illogical to value the well infrastructure without the reserves. The Taxpayers further claimed that the County relied on only one valuation approach, the cost approach, and failed to consider and properly reject the income or market approach. Conversely, the County maintained that it was entitled to exclude the gas reserves, and it considered and properly rejected the other approaches.

---

appropriate when assessing mineral lands such as the one in question. We have previously outlined the three approaches commonly used by taxing authorities for these assessments:

> The cost approach estimates the value of property based on the current cost of the asset, minus depreciation or reduced value from physical deterioration, functional obsolescence, and economic obsolescence. The income approach measures market value as the present worth of monetary benefits anticipated to be derived in the future from ownership of the asset. The sales approach calls for an analysis and comparison of recent sales of comparable property.

*McKee Foods Corp. v. County. of Augusta*, 297 Va. 482, 496 (2019) (internal quotations and citations omitted). "'Ideally, an appraisal should, if possible, derive its final determination of a property's value using all three approaches in order to maximize the likelihood that the valuation accurately reflects the property's fair market value.'" *Id.* (quoting *Keswick Club, L.P. v. County of Albemarle*, 273 Va. 128, 137 (2007)). If a taxing authority only uses one approach, the assessment is still entitled to the presumption of correctness if the taxing authority considered and properly rejected the other valuation methods. *Id.*

The County asserted that it did not need to research income or revenue as the well infrastructure does not generate income.

Along with using the cost approach, the County categorized the property as "special purpose." It did not formally research income data because it was valuing non-income generating assets such as the wells, pipelines, and compressors. The gas reserves were not taxed. Further, while the County was monitoring sales and was aware of the 2018 Sale, it concluded that the sale price was significantly below fair market value[2] because of certain impairments and disparities associated with it.[3] The County also relied on a 2011 trial court opinion and a 2013 agreement between the parties where they agreed to use the cost approach to value the improvements to the mineral lands at issue in this case.[4]

At trial, Steven Sprenger ("Sprenger"), a tax and audit consultant, testified as an expert for the Taxpayers. Sprenger testified that the preferred method for valuing assets in the oil and gas industry is "hands down" the income approach as the cost approach is not used to value these types of assets. Using the income approach, he valued the lands at $32,898,000 for 2018,

---

[2] The trial court referred to the fair market value as the "sale value."

[3] EQT took "large impairments to the assets in the amount of $2.3 billion and $118.1 million."

[4] Prior to the present case, EQT filed an application for correction of the tax assessments involving the same mineral lands at issue here. These assessments were completed by the County for the years 2002-2005. In 2011, the Court utilized the cost approach, which both parties agreed was appropriate. In 2013, the Commissioner entered into an agreement with EQT pertaining to the mineral land taxes. Under those terms, the parties agreed that the County would assess the improvements using the cost approach, whereas the land improved and under development and not under development would be calculated at a flat rate per acre. This approach applied for the years 2014-2017 and would continue unless one of the parties decided to change or terminate the agreement. The Commissioner terminated the agreement in 2017.

$22,234,000 for 2019, and $27,212,000 for 2020. Sprenger's valuation was based on the estimated amount of natural gas left in the reserves.

Sprenger further explained that gas wells have no value "independent of the mineral reserves" because "no one is going to pay you for the hole in the ground if that's [sic] nothing to get out of it." The value of gas wells, Sprenger claimed, is not separable from "the reserve value" because "it's all associated with the extraction of that commodity." According to Sprenger, the cost to reconstruct a well is irrelevant to fair market value because buyers and sellers only desire the well for the income derived from the reserves attached to the well. He insisted that, for that reason, the industry uses the income approach to determine the fair market value of gas wells.

The County called Paul Hornsby ("Hornsby"), a general appraiser, as its expert witness. Hornsby testified that he independently chose to use the cost approach, explaining that he chose that approach because he considered the lands "special purpose property," meaning they are unique and not adaptable to some other use. According to Hornsby, the International Association of Assessing Officers ("IAAO") recommends using the cost approach for special use properties. He further testified that he chose not to include the gas reserves in his assessment because he understood them to not have been pled in the petition nor to be part of the subject property. According to Hornsby, "[t]here is a correlation between the infrastructure and the reserves" but it is not "a direct correlation." However, Hornsby acknowledged that the infrastructure and the reserves typically sell as a single unit. He appraised the property at $183,960,000 for 2018, $142,360,000 for 2019, and $128,610,000 for 2020.

4

The trial court summarized the various valuations of the County and the experts:

| Tax year | Wise County Est. | Hornsby Est. (Wise County Expert) | Sprenger Est. (Taxpayers' Expert) | Total Sale Price |
|---|---|---|---|---|
| 2018 | $134,329,600 | $183,960,000 | $32,898,000 | $578,000,000 |
| 2019 | $134,329,600 | $142,360,000 | $22,234,000 | |
| 2020 | $104,573,100 | $128,610,000 | $27,212,000 | |

After considering the matter, the trial court affirmed the tax assessments. The trial court interpreted Code § 58.1-3286 to give the County the discretion to determine what property to assess. The trial court explained that taxing authorities may break down the land into components, and value each component separately. Alternatively, they may directly value and tax mined minerals alone. The trial court ruled that the County chose the first option to break the land into components and value each component separately. Thus, the County was within its statutory authority to value the well infrastructure without the reserves.

The trial court also determined that, because gas wells apart from gas reserves produce no income, the County properly considered and rejected the income approach. The trial court noted that the County considered and rejected the market approach because there was only one sale to consider—the sale to Diversified—and the County considered that "sale to be unreliable as demonstrative of property value." Thus, the trial court ruled that the presumption of validity applied to the County's assessment. Nor was there, in the trial court's view, manifest error to overcome that presumption because the IAAO treats gas wells as special use property for which the cost approach is appropriate and the County "carefully scrutinized" the sale to Diversified and determined that it "was not at arm's length."

Although the issue was not raised in the trial court, both parties agreed in their briefing to the Court of Appeals that the County levied a Code § 58.1-3712 tax on the Taxpayers.[5] The parties disagreed, however, on whether imposing a tax pursuant to Code § 58.1-3712 excused the County from assessing the gas reserves under Code § 58.1-3286.[6] In an unpublished opinion, the Court of Appeals affirmed the trial court's judgment, agreeing with the County's interpretation

---

[5] The County has an ordinance specifically stating that its "gas and oil severance license tax" is adopted pursuant to Code § 58.1-3712. Wise County Code § 19-38.

[6] In briefing to the Court of Appeals, Taxpayers referred to both Code §§ 58.1-3286 and -3712 taxes as "severance" taxes while still disputing that they are the same:

> The County *does* impose severance tax under Virginia Code § 58.1-3712. Wise County Code Sec. 19-38. But a severance tax under § 58.1-3286 cannot be imposed if a severance tax is imposed under § 58.1-3712. The County had no option other than to a[ss]ess the fair market value of lands "under development" under subdivision 1 of § 58.1- 3286.

The County argues that this "forecloses" the Taxpayers' argument that a Code § 58.1-3712 tax "is not a severance tax under Paragraph Four of Section 3286." We disagree. Taxpayers previously calling both taxes "severance" taxes does not preclude them from arguing that these taxes are distinct as that has been their consistent position since the issue arose. This is also evidenced in the Court of Appeals' opinion which notes the Taxpayers' argument:

> What the parties do not agree on concerning the statutes is 3712's impact on the Mineral Statute's operation. Taxpayers argue that the two statutes' taxes are distinct from each other. They assert that the County had to assess subdivision 1 unless it imposed a tax pursuant to the Mineral Statute, rather than a different law like 3712. Since they were only taxed under 3712, Taxpayers argue that Paragraph Four of the Mineral Statute is inoperative, and the County therefore had to assess subdivision 1 and the reserves.

*EQT Prod. Co. v. County of Wise*, 2025 Va. App. LEXIS 160, at *10-11 (March 18, 2025).

Further, the Taxpayers have been consistent in their position that the mineral lands *with* the reserves had to be valued under Code § 58.1-3286. The Taxpayers objected to the trial court's ruling that the County was excused from assessing the Mineral Lands per Code § 58.1-3286 and challenged it in the Court of Appeals and in this Court. *See* Rule 5:25 ("No ruling of the trial court…will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling…"). Thus, we do not find the argument waived.

that because it levied a Code § 58.1-3712 license tax, it was excused from assessing the gas reserves under subdivision 1 of Code § 58.1-3286. *EQT Prod. Co. v. County of Wise*, 2025 Va. App. LEXIS 160, at \*12-13 (March 18, 2025).

Further, the Court of Appeals held that the presumption of correctness applied because the County considered and properly rejected the income and market approaches. *Id.* at \*22. As Code § 58.1-3712 barred the County from assessing the gas reserves, the Court of Appeals determined that the income approach was inappropriate "because well infrastructure does not create any income." *Id.* at \*20. Moreover, the Court of Appeals held that the County gathered enough data about the 2018 Sale to properly reject the market approach. *Id.* at \*21. Finally, the Court of Appeals determined that the presumption of correctness was not rebutted. *Id.* at \*25.

The Taxpayers appeal.

## II. ANALYSIS

On appeal, the Taxpayers argue that the lower courts erred in ruling that the County was not obligated to value and assess the gas reserves under Code § 58.1-3286. They assert that levying a license tax under Code § 58.1-3712 does not excuse the County from assessing the gas reserves. We agree.

In Virginia, real estate must be assessed at its fair market value. Va. Const. art. X, § 2. Mineral lands "shall be assessed for local taxation in such manner and at such times as the General Assembly may prescribe." Va. Const. art. X, § 4. Further, "[t]axes can only be assessed, levied and collected in the manner prescribed by express statutory authority." *Hampton Nissan Ltd. P'ship v. City of Hampton*, 251 Va. 100, 104 (1996) (citing *Commonwealth v. P. Lorillard Co., Inc.*, 129 Va. 74, 81-82 (1921)).

7

In compliance with the Constitution of Virginia, the General Assembly established a tax assessment framework for mineral lands through Code § 58.1-3286 which requires counties to "specially and separately assess at the fair market value all mineral lands and the improvements thereon." Whether Code § 58.1-3286 requires the County to assess the gas reserves as part of land improved and under development is a question of statutory interpretation, which this Court reviews de novo. *CVAS 2, LLC v. City of Fredericksburg*, 289 Va. 100, 108 (2015). The question before us "'is not what the legislature intended to enact, but what is the meaning of that which it did enact.'" *Miller & Rhoads Building L.L.C. v. City of Richmond*, 292 Va. 537, 541 (2016) (quoting *Carter v. Nelms*, 204 Va. 338, 346 (1963)). In answering that question, we presume the "legislature says what it means and means what it says." *In re Woodley*, 290 Va. 482, 491 (2015); *see also City of Richmond v. VEPCO*, 292 Va. 70, 75 (2016) ("[Courts] assume that the General Assembly chose, with care, the words it used in enacting the statute."). "[W]hen the General Assembly has used specific language in one instance, but omits that language or uses different language when addressing a similar subject elsewhere in the Code, we must presume that the difference in the choice of language was intentional." *Zinone v. Lee's Crossing Homeowners Ass'n*, 282 Va. 330, 337 (2011). We are further guided by the principle that "[s]tatutes imposing taxes are to be construed most strongly against the government, and in favor of the citizen, and are not to be extended by implication beyond the clear import of the language used." *City of Winchester v. American Woodmark Corp.*, 250 Va. 451, 456 (1995).

When assessing mineral lands under Code § 58.1-3286, a county must assess three parts of the property:

1. The area and the fair market value of such portion of each tract as is improved and under development [("subdivision 1")];

2. The fair market value of the improvements upon each tract [("subdivision 2")]; and

8

3. The area and fair market value of such portion of each tract not under development [("subdivision 3")].[7]

Under the plain language of the statute, localities would normally be required to assess the fair market value of mineral lands using all applicable subdivisions. However, the legislature has expressly provided an exception to assessments under subdivision 1. Paragraph 4 of Code § 58.1-3286 states:

> In the alternative to the procedure outlined in subdivision 1 above, any county or city may impose by ordinance a severance tax on all coal and gases extracted from the land lying within its jurisdiction. The rate of such tax shall not exceed one percent of the gross receipts from such coal or gases.

In contrast with Code § 58.1-3286, Code § 58.1-3712(A) allows a locality to "levy a license tax on every person engaging in the business of severing gases from the earth."[8] A locality that chooses to impose such a license tax, however, "cannot enact the provisions of § 58.1-3286 relating to a tax on gross receipts." *Id.* Notably, the only portion of Code § 58.1-3286 that mentions a tax on gross receipts is the severance tax provision found in Paragraph 4. Thus, if a locality chooses to impose a license tax under Code § 58.1-3712(A), it must forego the severance tax under Paragraph 4 of Code § 58.1-3286 and the corresponding exception to assessments under subdivision 1. In so doing, the locality would also be required to assess the

---

[7] The parties agree that subdivision 3 is not at issue.

[8] We recognize that Code § 58.1-3712 is titled, "Counties and cities authorized to levy *severance tax* on gases." (emphasis added). However, "the title of an act is not part of the act itself." *Gilmore v. Landsidle*, 252 Va. 388, 394 (1996). "The purpose of the title is to state the general subject covered by the act, and the content of the title may be broader than the legislation specifically enacted." *Id.*; *see also Mozley v. Prestwould Bd. of Dirs.*, 264 Va. 549, 556 (2002) ("That summary title is not part of the statute enacted by the General Assembly and, thus, has no effect on the meaning of the body of the statute."). Although the title of the statute refers to the tax imposed as a severance tax, the fact remains that the General Assembly specifically refers to the tax as a license tax in the body of the statute. Accordingly, for the purposes of our analysis, the tax imposed by Code § 58.1-3712(A) is a license tax.

9

fair market value of mineral lands using all of the applicable subdivisions, including subdivision 1.

It is further worth noting that the specific nature of the taxes imposed by these statutes are demonstrably different. *See Commonwealth v. Shell Oil Co.*, 210 Va. 163, 166 (1969) ("The declaration in a statute that the tax is of a particular nature, while not conclusive, is very important and must be given consideration in construing the statute.") A "severance tax" is a tax imposed on the value of oil, gas, timber, or other natural resources extracted from the earth. Black's Law Dictionary 1767 (12th ed. 2024); *see also* 1A John A. Couch & Matthew S. Mauney, Regulation of the Gas Industry § 27.03[2] (William A. Mogel ed., 2025) (defining severance taxes as taxes that are "imposed by a state on the severing or lifting of nonrenewable natural resources, such as gas, oil, or coal, from the soil or water of the state.") With regard to license taxes, we have recognized that such taxes are not taxes on the property itself. *See Town of Ashland v. Board of Sups. for Hanover Cnty.*, 202 Va. 409, 413 (1961). Rather, with a license tax, "it is the privilege or franchise itself which is being taxed, and not the items by which the tax is measured." 1A Regulation of the Gas Industry, *supra* § 27.03[3].

We note that the severance tax imposed by Code § 58.1-3286 is to be paid by the owner of the mineral lands on all gases extracted from the property regardless of who extracted them. In contrast, the license tax imposed by Code § 58.1-3712(A) is to be paid by whomever severed the gases from the ground, which may not necessarily be the owner of the mineral lands. It is the *privilege* of being in the business of severing gases from the earth that is being taxed, as opposed to the property tax imposed under Code § 58.1-3286. *See* 1972 Op. Atty Gen. Va. 445, 446 (Oct. 26, 1972) (explaining that the severance tax in the predecessor to Code § 58.1-3286 was a property tax).

The fact that the severance tax under Paragraph Four of Code § 58.1-3286 and the license tax under Code § 58.1-3712 are mutually exclusive of each other is dispositive. Under the plain language of Code § 58.1-3286, the only circumstance under which a locality is not required to assess, and indeed is prohibited from assessing, the fair market value of mineral lands under subdivision 1 is when a severance tax under Paragraph 4 is imposed. Nothing in either Code § 58.1-3286 or Code § 58.1-3712 indicates that the General Assembly intended to similarly exclude an assessment of the fair market value under subdivision 1 when a license tax is imposed. Taken as a whole, it is readily apparent that the General Assembly has permitted three different avenues for localities to tax mineral lands. A locality may either: 1) directly assess the fair market value of the entire property pursuant to subdivisions 1 through 3 of Code § 58.1-3286; 2) levy a severance tax based on the gross receipts of all "gases extracted from the land lying within [the locality]" pursuant to Paragraph Four of Code § 58.1-3286 and directly assess the fair market value of only the improvements on the property and the undeveloped portion of the property pursuant to subdivisions 2-3 of Code § 58.1-3286; or 3) levy a license tax based on the "the gross receipts from the sale of gases severed within [the locality]" pursuant to Code § 58.1-3712(A) and directly assess the fair market value of the entire property pursuant to subdivisions 1 through 3 of Code § 58.1-3286.

As the County opted to impose a license tax under Code § 58.1-3712(A), it was obligated to assess the fair market value of the mineral lands pursuant to all three subdivisions in Code § 58.1-3286. As the record establishes that the County failed to assess a critical component of the fair market value analysis without being statutorily excused, its assessment of the Taxpayer's

11

property was incomplete and, therefore, plainly wrong. Accordingly, the lower courts' decisions affirming the County's assessment must be reversed.[9]

III. CONCLUSION

For the foregoing reasons, the lower courts erred in ruling that the County was not obligated to value and assess lands "improved and under development" in assessing Taxpayers' mineral lands under Code § 58.1-3286. Accordingly, we reverse the judgments of the Court of Appeals and trial court and remand the matter for further proceedings consistent with this opinion.

<em>Reversed and remanded.</em>

---

[9] Having determined that the County's assessment was plainly wrong, we need not reach assignments of error 2 or 3 regarding the presumption of correctness.